## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

EXPRESS SCRIPTS, INC.,           )
                                 )
      Plaintiff,                )
                                 )
v.                               )   CASE NO. 17CV01423 HEA
                                 )
SAMUEL J. LAVIN, et al.,         )
                                 )
      Defendants.               )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on the motion of Plaintiff Express Scripts, Inc. ("ESI") for a temporary restraining order (ECF Doc. No. 5). A hearing on ESI's motion was held on May 9, 2017, at which counsel for ESI and Defendants Samuel J. Lavin and Ocean Drug, Inc. d/b/a MDR Pharmaceutical Care ("MDR") appeared. For the following reasons, the motion will be granted.

## BACKGROUND

The facts summarized herein are set forth in ESI's Verified Complaint (ECF Doc. No. 1). ESI is a corporation engaged in the business of providing integrated pharmacy benefit management services including specialty pharmacy services. (*Id.* at ¶ 8). As pertinent here, ESI, through its Freedom Fertility business unit (which it acquired in 2005), provides specialty pharmacy services for infertility clinics and their patients. (*Id.* at ¶¶ 9-12). Like ESI, MDR nationally dispenses specialty

infertility medications to infertility clinics and their patients across the country. (*Id.* at ¶ 17).

Lavin began working for Freedom Fertility on August 3, 2001. (*Id.* at 20). On April 1, 2009, Lavin was promoted to the position of Director-Sales, which he referred to as National Sales Director, in the Freedom Fertility unit of ESI. (*Id.* at ¶ 21). As National Sales Director, Lavin's primary function was to drive the day-to-day business results through oversight and management within existing client business, strategic initiatives and other key customers. He was the leader of the critical charge to ensure the understanding and execution of the company sales and marketing plans through front line management including 12 account managers that he directly supervised, implementing regional strategies, account business plans, responding to market changes, and establishing goals and tactics at the team and individual contributor levels. He was responsible for leading all aspects of sales execution and development process for account and product penetration, and other sales achievements of a cross-segment sales team.

By virtue of his role as National Sales Director, Lavin personally called upon and interacted with actual and potential ESI customers in performing his job. (*Id.* at ¶ 24). He knows the identities of ESI's customers along with customer feedback and opinions (positive and negative) with respect to ESI's products and services, as well as those customers' contract history and status. (*Id.* at ¶ 26). As

National Sales Director, Lavin was privy to weekly, monthly and annual volume reports, strategic planning reports, and participated in pricing committee conference calls where strategy was discussed. (*Id.* at ¶ 27). Lavin's 15+ years of experience with ESI, the last eight years of which as National Sales Director, have provided him unique opportunities to build relationships with key decision makers on behalf of ESI's customers and potential customers. Due to those relationships, Lavin now has not only the ability to divert those clients from ESI to MDR, but he must do so in order to perform his job for MDR. (*Id.* at ¶ 35).

In consideration of his employment and the benefits and opportunities provided by ESI and in order for ESI to protect its confidential information and trade secrets, on February 7, 2014, Lavin electronically accepted a Nondisclosure, Nonsolicitation and Noncompetition Agreement (the "Agreement"). (*Id.* at ¶ 36; ECF Doc. No. 1-3). While Lavin now contends that he did not sign the Agreement, this Court finds, based on the evidence presented and arguments of counsel, that Lavin did, in fact, electronically sign and accept the Agreement.

On April 11, 2017, Lavin notified his supervisor, Todd Gritton (Sr. Director-Sales), that Lavin had received a job offer from MDR, that Lavin was inclined to accept the job offer, and that he requested ESI to provide him assurances that it would not enforce the restrictive covenants contained in his Agreement. Mr. Gritton told Lavin that he appreciated that Lavin notified him. (*Id.* at ¶ 40).

Because he was familiar with MDR and understood that it is a direct competitor of ESI in the specialty pharmacy business of infertility medication, Mr. Gritton told him that he would need a job description for the offered position, which would then be shared with ESI's human resources and legal department. Mr. Gritton further advised Lavin that, since MDR was a direct competitor of ESI in the specialty pharmacy business for infertility medication, it was unlikely that ESI's human resources and legal department would consent to Lavin working for MDR due to Lavin's obligations under the Agreement. (*Id.* at ¶ 41).

In response, Lavin told Mr. Gritton on April 11 that MDR was aware of the Agreement and, as a result, had prepared a job description for Lavin's position at MDR, entitled Executive Director of Customer Success. (*Id.* at ¶ 42; ECF Doc. No. 1-4). Furthermore, Lavin told Mr. Gritton that MDR prepared the Executive Director of Customer Success job description to be as broad, vague and general as possible in order to circumvent any issues with respect to Lavin's obligations under the Agreement. (*Id.* at ¶ 43). In subsequent discussions between Lavin and Mr. Gritton, on April 14, Mr. Gritton informed Lavin that ESI would not release him from his non-compete restrictive covenant obligations contained in his Agreement and would not approve his request to accept employment with MDR as its Executive Director of Customer Success. (*Id.* at ¶ 44).

While ESI rejected Lavin's request to accept employment with MDR, Mr. Gritton offered to work with Lavin to develop an exit strategy. For example, Mr. Gritton proposed that Lavin could work for a non-competing business, such as the genetic testing business, pharmaceutical manufacturing business, or some other business in the fertility field that was not in the specialty pharmacy services business, until the temporal limitations of his Agreement expired. Mr. Gritton also offered to write a letter of recommendation for Lavin. (*Id.* at ¶ 45). Lavin rejected Mr. Gritton's proposals. (*Id.* at ¶ 46).

On April 19, 2017, ESI formally notified Lavin that it believed that his role at MDR would be in direct violation of the Agreement between Lavin and ESI. ESI informed Lavin that he should not accept the position at MDR. (*Id.* at ¶ 47). On April 24, 2017, Lavin sent an email at approximately 10:00 p.m. informing ESI that he had resigned in order to accept the position with MDR. (*Id.* at ¶ 48; ECF Doc. No. 1-6).

ESI's Verified Complaint contends that Lavin's actions constitute a breach of contract, and that by hiring Lavin, MDR tortuously interfered with a contractual relationship. In addition, ESI asserts causes of action for violation of the Defend Trade Secrets Act, the Missouri Uniform Trade Secrets Act, and civil conspiracy.

In its motion for a TRO, ESI asks the Court to temporarily enjoin MDR from employing Lavin or using any confidential information derived from Lavin,

pending a preliminary injunction hearing. ESI asks that Lavin be similarly enjoined from working for or disclosing trade secrets or confidential information to MDR. Finally, ESI asks the Court to order expedited discovery in this matter and to set a hearing in this matter on ESI's motion for a preliminary injunction.[1]

In response, Lavin contends he did not sign the Agreement.[2] Defendants also note that Lavin subsequently signed an agreement with MDR, dated May 4, 2017, which purports to restrict Lavin from using or disclosing any of ESI's confidential information and trade secrets.

---

[1] Despite prior requests by ESI, Lavin failed to return his company owned and issued cellphone and tablet until May 16, 2017. Lavin has refused to provide his password for the devices which precludes ESI from accessing and inspecting the devices.

[2] The Agreement provides that any litigation arising under or relating to it shall be subject to the jurisdiction and venue in a Missouri court situated in the County of St. Louis, or in this Court. (ECF Doc. No. 1-3, Exhibit 1 at ¶12). The clause further provides that Lavin waived the right to contest the jurisdiction and venue of those courts. (*Id.*). Defendants filed motions to dismiss, contending that this Court lacked personal jurisdiction over them based on their assertion that Lavin did not sign the Agreement. As such, Defendants argued, the clause was not applicable. At the TRO hearing, the Court heard argument from counsel on these motions and denied them for the reasons stated on the record. The Court further notes that "Forum selection clauses are *prima facie* valid and are enforced unless they are unjust or unreasonable or invalid for reasons such as fraud or overreaching." *Union Elec. Co. v. Energy Ins. Mut., Ltd.*, 689 F.3d 968, 973 (8th Cir. 2012) (quoting *M.B. Restaurants, Inc. v. CKE Restaurants, Inc.*, 183 F.3d 750, 752 (8th Cir. 1999)). Moreover, "parties to a contract may agree in advance to submit to personal jurisdiction in a given court by means of a forum selection clause because personal jurisdiction is an individual right capable of being waived." *Whelan Sec. Co., Inc. v. Allen*, 26 S.W.3d 592 (Mo. App. 2000). Thus, the clause is enforceable and jurisdiction and venue are proper in this Court.

According to Defendants, this is a sufficient and less-restrictive means of preventing any irreparable harm. Defendants also contend that the customer information and price lists are publicly available and, therefore, not protectable interests. Finally, Defendants assert that ESI has offered mere conjecture regarding the purported misappropriation of trade secrets.

## DISCUSSION

In determining whether to issue a TRO, the Court must consider the following four factors: (1) the threat of irreparable harm to the movants; (2) the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movants will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc); *see also Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). The party requesting injunctive relief bears the "complete burden" of proving that an injunction should be granted. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

**Likelihood of Success on the Merits**

The Court is satisfied that ESI is likely to succeed on the merits of several of its claims, including its request for enforcement of the Agreement, as well as its request for injunctive relief in order to protect the disclosure of its confidential information and trade secrets.

Under Missouri law, non-compete covenants are enforced if they are reasonable under the circumstances and their enforcement serves legitimate protectable interests. *Mayer Hoffman McCann, P.C. v. Barton,* 614 F.3d 893, 908 (8th Cir. 2010). Defendants contend that the Agreement is overly broad and, therefore, unenforceable because it restricts Lavin's employment opportunities for one year in both the United States and Canada. The Court finds that the Agreement at issue is a narrowly-tailored effort by ESI to keep its information secret and retain competitive advantage, and it is more than adequately limited in scope.

With respect to scope, the Agreement is reasonable under the circumstances because Lavin was a high level and highly compensated executive of the Freedom Fertility business unit, the last eight years of which he served as National Sales Director at ESI. His noncompetition covenant limits his employment with MDR for only one year, which is reasonable as a matter of law. *Whelan Security Co. v. Kennebrew*, 379 S.W.3d 835, 846-47 (Mo. banc 2012)("Considerable precedent in Missouri supports the reasonableness of a two-year non-compete agreement. . ."); *Panera, LLC v. Nettles*, No. 16-cv-1181-JAR, 2016 U.S. Dist. LEXIS 101473, *6 (Aug. 3, 2016) ("the non-competition agreement at issue limits [defendant's] employment for only one year, which is reasonable"). Indeed, Missouri courts have held that non-compete agreements with a restrictive time period much longer than a one-year restriction are reasonable. *See, e.g.*, *Whelan*, 379 S.W.3d at 846-47;

*Alltype Fire Prot. Co. v. Mayfield*, 88 S.W.3d 120, 123 (Mo. App. 2002) (finding a two-year limitation on employment reasonable); *Church Mut. Ins. Co. v. Sands*, 2014 U.S. Dist. LEXIS 93303, at *9 (W.D. Mo. July 9, 2014) (holding a three-year non-compete agreement is enforceable).

Courts applying Missouri law also readily enforce geographical limitations that span nationwide. *See*, *e.g.*, *Sigma Chemical Co. v. Harris*, 586 F. Supp. 704, 710 (E.D. Mo. 1984)(enforcing two-year, worldwide limitation); *Superior Gearbox Co. v. Edwards*, 869 S.W.2d 239 (Mo. App. 1993) (enforcing a nationwide non-compete for five years). Here, as National Sales Director at ESI, Lavin personally managed or had direct oversight of ESI accounts across the country. He directly supervised twelve direct reports who handled sales in assigned regions across the country.[3]

Enforcing the Agreement also serves legitimate protectable interests of ESI. An employer has a legitimate protectable interest in its confidential and trade

---

[3] The Agreement also provides that if any of its restrictions are found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only to cover the maximum period of time, range of activities, or geographic area as to make such restriction reasonable as a matter of law and enforceable, as modified. (ECF Doc. No. 1-3 at ¶ 9). Missouri courts have the right to modify and enforce unreasonable restrictions to the extent they are reasonable. *Kennebrew*, 379 S.W.3d at 844 ("when the provisions of a non-compete clause impose a restraint that is unreasonably broad, appellate courts can still give effect to its purpose by refusing to give effect to the unreasonable terms or modifying the terms of the contract to be reasonable").

secret information (including customer lists), its customer relationships, and the goodwill that developed while Lavin worked for ESI. *Whelan Security Co. v. Kennebrew*, 379 S.W.3d 835 (Mo. 2012). The Missouri Supreme Court has recognized the employer's legitimate interest in customer contacts to "protect against 'the influence an employee acquires over his employer's customers through personal contact.'" *Kennebrew*, 379 S.W.3d at 842 (*quoting Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. 2006)). As such, customer non-solicitation provisions in relation to customers whom the employee dealt with, such as the provision in the Agreement, is reasonable to protect the employer's interests and, as such, enforceable. *Whelan*, 379 S.W.3d at 844-45. For example, in *Mid-States Paint & Chemical Co. v. Herr,* 746 S.W.2d 613, 618 (Mo. App. 1988), the court affirmed the lower court's holding that access to customer lists, pricing information, and formula books warranted enforcement of a restrictive covenant for period of three years.

Likewise, in *Cape Mobile Home Mart, Inc. v. Mobley*, 780 S.W.2d 116, 117-19 (Mo. App. 1989), the court affirmed the lower court's finding that a restrictive covenant was enforceable where an employee possessed access to monthly and year-to-date sales and profit statistics, quarterly business and sales reports, a companywide operations and procedures manual listing employer policies and procedures, as well as customer lists. The court also noted that the employer

advised employee that he would have access to a great deal of confidential information that he could not share.

Here, Lavin's continued access to and use of ESI's confidential information and trade secrets was robust, and – as set forth above – he was privy to ESI's most detailed confidential information and trade secrets regarding its customer relationships and goodwill, customer contracts, and business strategies moving forward. "An express agreement not to compete may be enforced as to employees having substantial customer contacts. It is not necessary to show that there is a secret customer list." *Emerson Elec. Co. v. Rogers*, 418 F.3d 841, 845 (8th Cir. 2005) (*quoting Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 75 (Mo. 1985)).

Moreover, ESI makes concerted efforts to keep the development of these systems and processes confidential by limiting access to these materials to high-level executives, all of whom sign non-compete agreements, and labeling highly-sensitive confidential documents as proprietary and confidential.

MDR fits squarely in the prohibited category of Paragraph 2(i) of the Agreement--*i.e.*: "pharmacy benefit management, including without limitation mail order and specialty pharmacy services, specialty pharmaceutical distribution, prescription drug claim's processing or formulary development or administration"--as that is the business line in which he worked for ESI. The restriction supports ESI's legitimate business interests in protecting its confidential information

and trade secrets, its goodwill, and it customer relationships.

In their opposition, Defendants argue that the tortious interference claim is "married to the baseless and problematic" breach of contract claim. (ECF Doc. No. 18 at p. 9). Essentially, Defendants claim that the tortious interference claim fails for the same reasons the breach of contract claim fails. As discussed above, this Court finds the breach of contract claim is likely to succeed on the merits. This Court also finds ESI likely to succeed on the merits of its tortious interference claim. "The elements of a claim for tortious interference with contract are: (1) a contract; (2) defendant's knowledge of the contract; (3) intentional interference by the defendant inducing or causing a breach of the contract; (4) absence of justification; and (5) damages resulting from defendant's conduct." *Howard v. Youngman*, 81 S.W.3d 101, 112-113 (Mo. App. 2002). The Court finds that ESI satisfies each.

As discussed above, Lavin appears to have breached the Agreement. The evidence demonstrates that MDR was aware of the Agreement. Lavin told his supervisor so. Lavin said that, not only was MDR aware of the Agreement, but it crafted a job description to be as broad, vague and general as possible in order to circumvent any issues with respect to Lavin's obligations under the Agreement. Moreover, Lavin asked ESI to release him from his obligations under the Agreement so that he could work for MDR. ESI refused. Lavin resigned anyway

and MDR began employing despite its knowledge of the Agreement and the refusal to release the restrictions. At this point, MDR has provided no justification for such behavior.

The Court also finds ESI likely to succeed on the merits of its trade secret claims. The DTSA defines "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). The definition of "trade secret" under the MUTSA is substantially the same. *See* Mo. Rev. Stat §417.453(4). ESI has established the information possessed by Lavin constitutes "trade secrets" under the statutes, and that Lavin may have actually misappropriated or threatens to misappropriate them. Here, Lavin has created, contributed to the creation of, and been privy to a host of confidential information and trade secrets, including: the names of and specific contacts at ESI's customers and potential customers; all contracts between ESI and its customers, along with the terms of those contracts; customer feedback and

opinions (positive and negative) with respect to ESI's products and services, as well as their contract history and status; marketing plans, including new products in development; and the pricing and profit margins of ESI's products. As National Sales Director, Lavin was privy to weekly, monthly and annual volume reports, strategic planning reports, which contain such information. (ECF Doc. No. 1 at ¶¶ 23-27).

ESI's confidential contract and customer information, including the identity of customers and potential customers, the terms of contracts, the reimbursement schedules and rates for such contracts, marketing plans, and new products in development provide independent economic value to ESI and fall within the definition of trade secrets.

The evidence demonstrates that ESI undertakes reasonable measures to keep confidential and secret its confidential contract and customer information, including the identity of customers and potential customers, the terms of contracts, the reimbursement schedules and rates of the contracts, marketing plans, and new products in development. For example, ESI requires employees to sign nondisclosure, nonsolicitation and noncompetition agreements, as Lavin did.

In addition, documents generally are password protected and contain "confidential" legends, and ESI conducts security monitoring of external e-mails and document transfers. ESI gains a benefit from having its confidential

information and trade secrets remain unknown outside ESI.  Conversely, its competitors, such as MDR, would profit at ESI's expense from knowing such information and trade secrets.

Moreover, if Lavin is permitted to work at MDR, his use and disclosure of the trade secrets are inevitable. This is so because (1) the nature of his responsibilities at MDR are akin to those he held for ESI and require his consideration of ESI's trade secrets in the faithful performance of those responsibilities, and (2) Lavin's actions, and the obfuscation engaged in by Lavin and MDR since Lavin first announced his intent to accept the position at MDR (including the manufacturing of the job description specifically to avoid Lavin's obligations under the Agreement), demonstrate a lack of candor and an unwillingness to preserve confidentiality on the part of Lavin and MDR. *See H&R Block Eastern Tax Services, Inc. v. Enchura*, 122 F. Supp. 2d 1067, 1074-75 (W.D. Mo. 2000). Such threatened misappropriations also can be enjoined. Mo. Rev. Stat §417.455.1.

Lavin will have decision-making authority in his job at MDR; his responsibilities will be similar to those he held with ESI; his ESI position required his use of ESI's trade secrets and so will his job at MDR; Lavin developed, or contributed to the development of, the ESI trade secrets at issue; and the nature of

the trade secrets Lavin possesses are easily subject to memorization. *See H&R Block Eastern Tax Services*, 122 F. Supp. 2d at 1075.

**Irreparable Harm to ESI Absent an Injunction**

"[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). This Court finds ESI will suffer irreparable harm if the terms of the restrictive covenants are violated. "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002). "Courts generally hold that the disclosure of confidential information such as customer information and business strategy will result in irreparable harm to the plaintiff." *Experitec, Inv. v. Stachowski*, 2014 U.S. Dist. LEXIS 185282, at *7 (E.D. Mo. Jan. 30, 2014).[4] Defendants contend that Lavin's new role at MDR, as its Executive Director of Customer Success, is one where Lavin is not and will not be seeking to acquire

---

[4] The Court notes that Lavin's role as ESI's National Director of Sales also required him to manage existing ESI relationships. In fact, the first sentence of ESI's job description for Lavin's position states that "The primary function of the Director of Account Management is to drive the day-to-day business results through oversight and management *within existing business*, strategic initiatives and other key customers." (ECF Doc. No. 1-5) (emphasis added).

new business or sales for MDR. Instead, they claim, Lavin's position will be managing existing MDR relationships.

Defendants also put much stock into an "agreement" they purportedly entered into two days after ESI filed this lawsuit, which purportedly restricts Lavin from disclosing any confidential information or trade secrets of ESI. (ECF Doc. No. 18-4). The Court finds these arguments unpersuasive at the TRO stage. Notably, this "agreement" does not restrict Lavin from violating the non-solicitation and non-competition provisions of his Agreement with ESI. Thus, even by its own terms, the "agreement" is insufficient to prevent irreparable harm to ESI.

It is not necessary for the employer to show that actual damage has occurred in order to obtain injunctive relief. *Ashland Oil v. Tucker*, 768 S.W.2d 595, 601 (Mo. App. 1989); *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 75 (Mo. 1985). If the covenant is lawful, and the opportunity for influencing the employer's customers to the former employer's disadvantage, enforcement is appropriate. *Ashland Oil*, 768 S.W.2d at 601; *Osage Glass*, 693 S.W.2d at 75; *see also Systematic Business Services, Inc. v. Bratten*, 162 S.W.3d 41, 51 (Mo. Ct. App. 2005) (where the restrictive covenant is valid and the former employee has an opportunity to influence his former employer's customers, actual damages are not necessary to obtain permanent injunctive relief).

"The district court is empowered to issue an injunction 'even without a showing of past wrongs,' so long as 'there exists some cognizable danger of recurrent violation.'" *Church Mut. Ins. Co. v. Sands*, 2014 U.S. Dist. LEXIS 110953, at *6 (W.D. Mo. Aug. 11, 2014) (quoting *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). A former employee's "possible disclosure or use of confidential information such as customer information" is relevant in determining irreparable harm. *Id.* (quoting *Medtronic, Inc. v. Gibbons,* 684 F.2d 565, 569 (8th Cir. 1982)).

"The mere violation of a valid non-compete agreement can support an inference of the existence of a threat of irreparable harm." *Sands*, 2014 U.S. Dist. LEXIS 110953, at *7 (W.D. Mo. Aug. 11, 2014) (citing *N.I.S. Corp. v. Swindle*, 724 F.2d 707,710 (8th Cir. 1984)). Irreparable harm is also properly presumed where there is evidence that a covenant not to compete is breached or confidential, proprietary information is being improperly used. *H&R Block Tax Servs. LLC v. Haworth*, 2015 U.S. Dist. LEXIS 127010 (W.D. Mo. Sept. 22, 2015).  As in *Haworth*, monetary relief will not adequately protect ESI's interests in these relationships, and it cannot fully remedy ESI's loss of goodwill, confidential information and other legitimate business advantage. *Id.* at *9.

In addition, "[c]ourts regularly find irreparable harm where a non-compete agreement states that it breach constitutes irreparable injury." *Panera, LLC v.*

*Nettles*, 2016 U.S. Dist. LEXIS 101473, at \*10-11 (E.D. Mo. Aug. 3, 2016). Such is the case here. Lavin agreed with ESI that "the breach of any provision of this Agreement shall result in irreparable injury and damage to the Company, that there is no adequate remedy at law for such breach, and that the Company should be entitled to specific performance, injunctive relief and other equitable remedies in addition to any remedies provided by law, together with the Company's attorney's fees and costs." (ECF Doc. No. 1 at ¶¶ 36-37; ECF Doc. No. 1-3 at ¶ 11).

As recently acknowledged by the Court, in *Nettles*, while Missouri has not formally adopted the doctrine of inevitable disclosure, the Court found the rationale underpinning the theory helpful in understanding how a former employee's performance in his new role would "almost certainly require him to draw upon and use trade secrets and the confidential strategic planning to which he was privy." *Nettles*, 2016 U.S. Dist. LEXIS, \*11-12. The Court then held that the disclosure of confidential information such as business strategy would result in irreparable harm to the former employer, and the Court agreed that the employee's employment with the new employer was likely to lead to such disclosure. *Id.* Lavin's entire career has been in the sale of infertility medication to fertility clinics, the medical professionals employed by such clinics and their patients.

This Court went on to hold that, even without relying on such inevitable disclosure, where the irreparable harm includes not only the divulgence of trade

secrets, but also the violation of a binding non-competition agreement, the remedy at law is inadequate because such damages would be difficult if not impossible to measure. *Id.* at *12. The Court also found it significant that the employee had agreed, as Lavin did here, that his breach would constitute irreparable harm. The same rationale applies to this case. The Court finds that ESI has demonstrated that, absent injunctive relief, it has suffered and will continue to suffer irreparable harm.

**Balance of Harms**

The Court finds that in contrast to the irreparable harm that ESI will suffer if injunctive relief is not granted, Defendants will suffer comparatively slight harm. Lavin accepted employment with MDR after being told by ESI that doing so would violate his Agreement because MDR is a direct competitor of ESI in the fertility specialty pharmacy business, a narrow and competitive industry. While Lavin will not be permitted to immediately join MDR, he remains free to obtain other employment that calls for his general management and/or sales skills. Lavin's supervisor even told him that Lavin was free to seek employment in the fertility industry, but he could not work for a competitor in the specialty pharmacy business, as MDR clearly is. Additionally, the harm to Lavin, if enjoined at least until such time as the Court can hold a preliminary injunction hearing, can be satisfied by the payment of any monies that may be lost during the period of non-employment. Thus, the harm that ESI has suffered, and will continue to suffer

absent an injunction, outweighs any harm that may befall Defendants if their actions are enjoined.

**The Public Interest**

Here, the balance of the equities also favors granting ESI's motion for injunctive relief. Enjoining Defendants from violating ESI's contractual rights and federal and Missouri statutes will not harm the public, as it will continue to have access to MDR's (and other competitors') products and services. Conversely, denying injunctive relief will cause ESI irreparable harm, undermine the enforcement of federal and Missouri statutes, deny ESI the benefit of its bargain with Lavin, and cost ESI business and clients that it would not have lost but for the current situation. Moreover, parties should be able to rely on each other to comply with their agreements and should be able to rely on the courts to enforce agreements when they are breached. The public interest thus weighs in favor of enjoining Defendants as requested by ESI.

## CONCLUSION

Based upon the foregoing analysis, the Court concludes a temporary restraining order is appropriate.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for a temporary

restraining order (ECF Doc. No. 5) is **GRANTED**. The Court hereby orders as follows:

1.    That Defendant Samuel J. Lavin ("Lavin") shall immediately cease and desist, and is hereby enjoined from either directly or indirectly acting on behalf of, advising, consulting, or working for Defendant Ocean Drug, Inc. d/b/a MDR Pharmaceutical Care, together with any related affiliates or subsidiaries (collectively "MDR"), and shall remain enjoined from working for MDR until further order;

2.    That MDR shall immediately cease and desist, and is hereby enjoined from either directly or indirectly seeking advice from, consulting with, employing or permitting Lavin to provide services to MDR, and shall remain enjoined from so doing until further order;

3.    That Lavin shall be enjoined from seeking, acquiring, using, or disclosing any of ESI's trade secrets or confidential information;

4.    That MDR shall be enjoined from seeking, acquiring, using, or disclosing any of ESI's trade secrets or confidential information that Lavin acquired in the course of, or arising out of, his employment with ESI;

5.    That Lavin shall preserve all documents and information that he acquired or took from ESI;

6.    That Lavin shall provide counsel for ESI with his password(s) for the ESI owned cell phone and tablet within six hours of the entry of this Order;

7.    That Lavin shall be enjoined from breaching the Nondisclosure, Nonsolicitation and Noncompetition Agreement he signed on February 7, 2014.

8.    The parties shall submit to a deposition upon three business days' notice;

9.    The parties shall respond to any interrogatories under F.R.C.P. 33 and to any document requests under F.R.C.P. 34 within seven days of service of same; and

10.    Pursuant to Fed. R. Civ. P. 65(b)(2), this Order shall remain in effect until the next hearing on this matter, on Plaintiff's motion for a preliminary injunction, which the Court hereby sets for July 17, 2017, at 11:00 a.m., or such other appropriate time to which the parties consent and agree, in the courtroom of the undersigned.

Dated this 7th day of July, 2017.


_____
HENRY EDWARD AUTREY

UNITED STATES DISTRICT JUDGE